**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| One Proud Toddler, LLC,<br>Plaintiff,<br>v.<br>Fridababy, LLC,<br>Defendant. | Civil Action No.<br>**JURY TRIAL DEMANDED** |

# COMPLAINT

Plaintiff One Proud Toddler, LLC ("OPT"), complaining of Defendant Fridababy, LLC ("Frida"), alleges as follows:

## NATURE OF THE ACTION

1. This is an action for patent infringement arising under the Patent Laws of the United States, including 35 U.S.C. §§ 271 and 284, concerning U.S. Patent No. 11,647,875 (the "'875 Patent"). The '875 Patent is directed to a collapsible child toilet seat.

2. Plaintiff OPT is a small, family-owned American business started by two parents who recognized the need for a safe, portable folding potty seat. OPT researched, developed, engineered, tested, and brought the Potty Proud Folding Potty Seat (the "Potty Proud Seat") to market, while its founders pursued patent protection for the underlying folding toilet-seat technology. The Potty Proud Seat is an innovative folding toilet-training seat manufactured and assembled in the United States and is a commercial embodiment of technology protected by the '875 Patent.

3. OPT launched the Potty Proud Seat in late May 2022, while its founders were actively pursuing patent protection. Within months of launch, personnel of Defendant

Frida, including senior product-development and partnerships personnel, began seeking and obtaining access to OPT's product. The Potty Proud Seat and its packaging were clearly marked "Patent Pending" throughout this period.

4. In October 2022, Frida's then-Head of Events and Partnerships, Bianca Rocco, attempted to obtain a Potty Proud Seat through OPT's website. OPT questioned the transaction, expressed concern that Frida might be seeking the product to develop a competing product, and cancelled the order. Rocco thereafter represented that the seat was intended as a personal gift and affirmatively invited OPT to discuss a potential collaboration, causing OPT to reconsider its concern and provide a complimentary Potty Proud Seat to the recipient Rocco had designated at Frida's Miami headquarters. As alleged below, the circumstances support the inference that those representations—as well as others made by Rocco in the same communication—were false or misleading and were designed to obscure Frida's actual or complete purpose in seeking access to OPT's product.

5. Subsequent events prompted OPT to review its historical sales records, which revealed that, approximately two months before the Rocco-arranged acquisition and only three months after the launch of the Potty Proud Seat, Edward Abante—then a senior R&D and product-development executive at Frida—had separately purchased a Potty Proud Seat directly from OPT using a Frida email address.

6. Approximately one year after Abante's purchase, and approximately ten months after the Rocco acquisition, Frida introduced and began commercializing its China-manufactured Fridababy Fold-and-Go Potty Seat (the "Accused Product" or "Fold-and-

Go"). From the Fold-and-Go's launch through the filing of this action, the Potty Proud Seat was OPT's sole commercialized product and the economic foundation of its business.

7. OPT alleges that the Fold-and-Go infringes the '875 Patent and incorporates a constellation of physical features closely corresponding to features of the Potty Proud Seat. The circumstances surrounding Frida's acquisition of and efforts to obtain OPT's product, together with information concerning potentially similar product-acquisition and development conduct involving other small and emerging baby-product companies—including another founder's independent identification of Abante in connection with Frida's reported acquisition of her products—bear on the purpose and deliberateness of Frida's conduct toward OPT.

8. No later than July 12, 2024, Frida had actual knowledge of the '875 Patent when it received detailed written notice identifying the accused Fold-and-Go and alleging infringement of the '875 Patent, accompanied by a claim chart. On April 30, 2025, OPT again provided Frida with detailed written notice of infringement, supported by additional analysis and an expanded photographic claim chart.

9. OPT has repeatedly attempted to resolve this dispute without litigation and has sought to negotiate a business resolution. When Frida identified references it contended undermined the '875 Patent and set out its noninfringement position, OPT conducted a substantial investigation of those references and responded in detail to Frida's invalidity and noninfringement positions, explaining why the identified references did not invalidate the '875 Patent and providing an expanded photographic claim chart further illustrating OPT's infringement allegations. Frida did not substantively address OPT's analysis of

those references or the expanded photographic claim chart. Instead, it newly asserted indefiniteness and stated that it had "identified additional references that further call into question the validity of the '875 Patent," which it did not disclose to OPT. Frida continued commercializing the Fold-and-Go without a license and did not pursue the Patent Office proceedings it had threatened, even after OPT expressly invited it to do so. After repeated unsuccessful efforts to resolve the dispute, OPT now brings this action to protect the patented invention and the business OPT built around it.

## PARTIES

10. Plaintiff OPT is a California limited liability company and a small, family-owned business founded and operated by two parents. OPT maintains a registered business address in Coronado, California.

11. OPT develops, manufactures, markets, and sells the Potty Proud Seat, a folding child toilet-training seat that is manufactured and assembled in the United States.

12. Defendant Frida is a Delaware limited liability company headquartered in Miami, Florida.

13. Frida makes, uses, offers to sell, sells, and/or imports into the United States the Fold-and-Go Potty Seat, including through national retail and e-commerce channels.

## JURISDICTION AND VENUE

14. This is an action for patent infringement arising under the patent laws of the United States.

15. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1338 because it arises under an Act of Congress relating to patents.

16. OPT is the owner by assignment of all right, title, and interest in U.S. Patent No. 11,647,875, titled "Collapsible Child Toilet Seat" (the "'875 Patent"), including all claims, remedies, and rights to sue and to recover damages for past, present, and future infringement.

17. OPT has the right to bring this civil action to remedy Frida's infringement of the '875 Patent.

18. This Court has personal jurisdiction over Frida because Frida is a limited liability company organized under the laws of Delaware.

19. Venue is proper in this District under 28 U.S.C. § 1400(b) because Frida resides in this District for purposes of the patent venue statute.

## FACTUAL ALLEGATIONS

20. The '875 Patent issued on May 16, 2023 from U.S. Patent Application No. 17/327,371, filed on May 21, 2021.

21. The '875 Patent identifies OPT's co-founders, Ryan Bailey and Ji Hyun Chon, as the named inventors and is directed to a portable child toilet-training seat that can be deployed for use atop a conventional toilet seat and folded into a compact configuration for storage and travel.

22. A true and correct copy of the '875 Patent is attached as Exhibit A.

23. The invention addresses a practical and recurring problem for parents and caregivers: toddlers and small children often cannot safely and comfortably use conventional adult toilet seats, particularly in public restrooms, because they are too small to sit securely on those seats without balancing on seat edges or being held by an adult.

The ’875 Patent describes this problem as particularly acute when families are away from home.

24. The ’875 Patent describes a body that folds between a deployed substantially U-shaped configuration and a compact collapsed configuration, while a non-slip skirt or flange extending from the bottom surface of the device securely engages atop an existing toilet seat when deployed.

25. The flange-based interface engages the underlying toilet seat and creates a structural relationship in which the lower surface of the body remains spaced from the toilet seat.

26. The ’875 Patent depicts a bottom perspective view of an exemplary




embodiment of the disclosed folding toilet seat invention as follows:

27. Claim 11 of the ’875 Patent recites as follows, with bracketed limitation identifiers added for ease of reference:

> 11. A collapsible toilet seat, comprising:
> [a] a body, said body having a deployed position having a substantially U-shape and having an upper surface opposite a lower surface;
> [b] said body foldable from said deployed position to a collapsed position;
> [c] said body in said deployed position being positionable atop a toilet seat;
> [d] said body having a first body portion in a first pivoting engagement with a second body portion;
> [e] said first body portion having a first segment in a second pivoting engagement with a second segment;
> [f] said second body portion having a third segment in a third pivoting engagement with a fourth segment;
> [g] a flange extending from a perimeter edge of said body;
> [h] said flange forming the contact of said body in said deployed position with said toilet seat; and
> [i] a gap formed between said lower surface of said body and said toilet seat when positioned thereon.

28. Claim 14 depends from Claim 11 and further recites the additional limitation of “a pliable cover positioned upon said flange.”

29. The image below is a depiction from the ’875 Patent of one exemplary embodiment of the disclosed folding toilet seat invention. The depiction shows a close-up of a flange projecting downwardly and outwardly from the perimeter of the body, a pliable cover positioned upon the flange, and recessed portions of the lower surface. In this exemplary embodiment, when the device is positioned atop a toilet seat, the pliable cover contacts the underlying toilet seat, and the lower surface of the body remains spaced from that seat.




FIG. 8

30. The ’875 Patent discloses multiple embodiments of the perimeter contact structure. In one disclosed embodiment, the flange itself contacts the underlying toilet seat; in another, a pliable cover positioned upon the flange contacts the toilet seat.

31. The specification further describes the perimeter contact structure as a “non-slip skirt or flange extending from the bottom surface of the device” and explains that this non-slip skirt or flange, which extends substantially around the exterior perimeter of the body, provides an especially secure, non-slip engagement with the underlying toilet seat.

32. OPT developed the Potty Proud Seat as a commercial embodiment of the patented invention and brought it to market in late May 2022 while its founders were actively pursuing patent protection.

33. The Potty Proud Seat entered the market as an innovative, U.S.-manufactured, folding potty-training seat designed to provide caregivers with a portable and secure alternative for toilet training at home and away from home.

34. A picture from OPT's website depicting the Potty Proud Seat is below:




35. When the Potty Proud Seat first launched in late May of 2022, it was clearly marked Patent Pending on both the physical product and its packaging.

36. Beginning no later than April 2024, OPT virtually marked the Potty Proud Seat pursuant to 35 U.S.C. § 287(a) by marking the product with OPT's patent-marking Internet address, which listed the '875 Patent among three patents directed to the Potty Proud Seat.

**FRIDA ACQUIRES THE POTTY PROUD SEAT, TWICE**

37. Shortly after the launch of the Potty Proud Seat in late May 2022, Frida personnel began acquiring OPT's product. On August 26, 2022, Edward Abante purchased a Potty Proud Seat directly through OPT's website using a Frida email address and selected expedited shipping. The product was delivered to the Miami, Florida address Abante provided on August 29, 2022. At the time, OPT did not recognize the significance of Abante's purchase.

38. Publicly available information indicates that, at or around that time, Mr. Abante held senior product-development leadership responsibilities at Frida, including serving as Vice President of R&D Engineering and Interim Chief Product Officer. Abante is a named inventor on dozens of U.S. patents and patent applications.

39. Approximately two months after Mr. Abante's purchase, on October 24, 2022, Bianca Rocco, Frida's then-Head of Events and Partnerships, separately sought to obtain a Potty Proud Seat through OPT's website using her Frida email address, with delivery to Frida's Miami headquarters and billing information corresponding to that same address.

40. OPT questioned the Rocco order because it was placed under a different name using Rocco's Frida email address and American Express card, and because both the delivery address and billing information corresponded to Frida's Miami headquarters. These circumstances raised concern that Frida was seeking OPT's product for product-development purposes.

41. The following day, on October 25, 2022, OPT advised Ms. Rocco that OPT's Terms of Service prohibited purchasing OPT's product through its website for purposes of developing competing products and raised concern that Frida might be seeking the product for competitive product development purposes. OPT also explained that it was a small family-owned company whose founders had "poured our hearts into developing this product," and noted that, as a general matter, OPT was open to collaboration discussions. At that time, OPT offered the Potty Proud Seat for sale exclusively through its website.

42. When OPT did not receive a prompt response, OPT cancelled the pending transaction.

43. Approximately two days later, on October 27, 2022, Rocco responded via email that she understood why the transaction "looks a bit odd" and represented that the product was intended as a personal gift for her assistant's pregnant cousin, while stating that she herself was "based out here in LA." She also stated that Frida was "out of stock of our own!" and that "we do not discriminate against other brands," identified herself as the person who headed partnerships at Frida, and told OPT that she "would *love* to discuss potential collaborations." At that time, Frida did not offer or sell a folding potty seat.

44. Ms. Rocco's explanation and invitation to discuss a potential collaboration caused OPT to reconsider its concern, and OPT provided a complimentary Potty Proud Seat to the recipient Ms. Rocco had originally designated at Frida's Miami headquarters, consistent with OPT's practice of providing sample seats to potential business partners and other persons or organizations involved in parenting, potty training, and child-development activities.

45. Ms. Rocco thereafter thanked OPT and stated that she would follow up with OPT, but Frida did not substantively pursue collaboration discussions with OPT. OPT subsequently attempted to follow up with Ms. Rocco by telephone, but never received a response.

46. The circumstances and timing of Ms. Rocco's response, considered together with Mr. Abante's earlier acquisition of the Potty Proud Seat, support an inference that Frida sought access to OPT's product for product-development purposes and that Ms. Rocco's stated explanations for the transaction and expression of interest in a potential collaboration were intended to dispel OPT's expressly stated concerns regarding competitive product development.

47. At the time of the Abante purchase and the Rocco acquisition, the physical Potty Proud Seat and its packaging were clearly marked "Patent Pending."

48. In or about August 2023, shortly after issuance of the '875 Patent, Frida began commercializing the Fold-and-Go, a competing folding child toilet-training seat.

49. An image of the Fold-and-Go, taken from Amazon.com, is below:




50. The Fold-and-Go is a collapsible, substantially U-shaped folding toilet seat having four segments and three hinges or pivoting engagements.

51. The Fold-and-Go incorporates a perimeter structure extending substantially about the exterior perimeter of the product's body. Frida's marketing copy refers to the Fold-and-Go as having a "non-slip base" and "handles." Those terms correspond to regions of that perimeter structure.

52. Regardless of Frida's marketing terminology, the Fold-and-Go has a flange extending from a perimeter edge of its body. That flange extends substantially about the exterior perimeter of the Fold-and-Go's body. When the Fold-and-Go is in the deployed

position atop an underlying toilet seat, that flange forms the contact of the body with the toilet seat, and a gap is formed between the lower surface of the body and the toilet seat.

53. Below is a bottom-perspective comparison of the Fold-and-Go—with the structure OPT contends corresponds to the claimed flange highlighted in blue—and an embodiment of the folding toilet seat depicted in the ’875 Patent:

**Frida Fold-and-Go**



**’875 Patent**




54. The physical similarities between the Potty Proud Seat and the Fold-and-Go include a constellation of design and structural features, including distinct rounded and contoured front body segments, recessed body portions, similar hinge configurations, and the perimeter flange-based contact architecture claimed in the ’875 Patent.

55. To the extent Frida examined, measured, reverse engineered, or otherwise evaluated the Potty Proud Seat sufficiently closely in connection with development of the Fold-and-Go, the Patent Pending marking on the product would have been readily

observable and would have placed Frida personnel on notice that OPT was pursuing patent protection.

56. Based on Abante's direct purchase of the Potty Proud Seat approximately three months after its launch, during a period in which he held senior research and development and product leadership roles at Frida; Rocco's separate, ultimately successful effort approximately two months later to obtain another Potty Proud Seat, including her affirmative expression of interest in a potential collaboration after OPT raised its concerns and cancelled the pending transaction; the timing of Frida's subsequent launch of the Fold-and-Go; and the similarities between the products, OPT alleges on information and belief that Frida used one or both Potty Proud Seats in connection with its evaluation and development of the accused Fold-and-Go. These circumstances also support the inference that Ms. Rocco's response as a whole—including her personal-gift explanation, her statements that Frida was "out of stock of our own!" and that "we do not discriminate against other brands," and her affirmative expression of interest in a potential collaboration—was intended to reassure OPT and was false or misleading as to the actual or complete purpose for which Frida sought access to OPT's product.

## FRIDA COMMERCIALIZES AND EXPANDS DISTRIBUTION OF THE FOLD-AND-GO

57. OPT sells the Potty Proud Seat through OPT's website and Amazon.com at retail prices generally ranging from $35.95 to $38.99, and occasionally discounts the product to approximately $29.99.

58. OPT's regular retail pricing reflects, among other things, the substantial investment and commercial risk involved in researching, developing, engineering, tooling, testing, and bringing the Potty Proud Seat to market; the costs of marketing efforts to educate consumers and build market awareness and demand for a visually distinct new product; the costs of manufacturing and assembling the Potty Proud Seat in the United States; and OPT's business overhead.

59. When Frida began commercializing the Fold-and-Go in or about August 2023, OPT had already spent years developing and engineering the Potty Proud Seat and had borne the market-entry and consumer-education costs and commercial risk associated with bringing its differentiated architecture to market and establishing consumer demand. By contrast, as alleged above, Frida personnel obtained OPT's product only months after launch and, on information and belief, Frida used the product in developing and introducing the Fold-and-Go, a directly competing product. By the time Frida entered the market with the Accused Product, the Potty Proud Seat had already begun demonstrating substantial commercial traction.

60. Frida possessed significant resources to support the launch of the accused Fold-and-Go, including an established national brand, substantial marketing capabilities, existing retailer relationships, access to a national distribution network, and a mature global supply chain. Frida used those resources, together with overseas manufacturing in China, to market and distribute the Accused Product rapidly and to sell it at prices that have varied over time from approximately $8.00 to $16.99—well below OPT's regular retail prices of approximately $35.95 to $38.99.

61. By combining the patented folding toilet-seat architecture with lower pricing, manufacturing in China, extensive promotion, and broad distribution, Frida quickly captured sales and marketplace momentum for the Fold-and-Go, as reflected in its prominent sales ranking and substantial consumer-review volume on Amazon.com. At approximately the same time as Frida began selling the accused Fold-and-Go on Amazon.com, or shortly thereafter, it also began offering the product on Walmart.com and Target.com.

62. During the same general period, or shortly thereafter, Frida began rapidly expanding the Accused Product into brick-and-mortar retail through a nationwide rollout in Walmart stores. Frida subsequently expanded the Fold-and-Go into Target stores nationwide. That broad brick-and-mortar distribution placed the Accused Product before consumers at physical retail locations throughout the country and extended Frida's market reach beyond the major e-commerce platforms described above.

## THE FRIDA FOLD-AND-GO INFRINGES THE '875 PATENT

63. The Fold-and-Go literally infringes at least Claim 11 of the '875 Patent because the Accused Product satisfies each limitation of that claim. The infringement allegations set forth below are based on the language of Claim 11 as informed by the specification and on the observable structure and operation of the Fold-and-Go. OPT further alleges infringement of Claim 14, including under the doctrine of equivalents to the extent necessary.

64. The Fold-and-Go is a "collapsible toilet seat" as recited in Claim 11. It is sold and promoted as a portable child toilet-training seat that folds for transport and unfolds for

use atop a conventional toilet seat. The Fold-and-Go satisfies each limitation of Claim 11 because:

a. its body, in the deployed position, has a substantially U-shape and has an upper surface opposite a lower surface;

b. its body is foldable from the deployed position to a collapsed position;

c. its body, when in the deployed position, is positionable atop a toilet seat;

d. its body has a first body portion in a first pivoting engagement with a second body portion;

e. the first body portion has a first segment in a second pivoting engagement with a second segment;

f. the second body portion has a third segment in a third pivoting engagement with a fourth segment;

g. the Fold-and-Go has a flange extending from a perimeter edge of its body. Frida's marketing copy uses the terms "non-slip base" and "handles" to describe regions of this flange structure. That flange extends downwardly and, in places, outwardly from the perimeter edge of the body, substantially about the exterior perimeter thereof;

h. the flange forms the contact of the Fold-and-Go's body, in the deployed position, with the underlying toilet seat; and

i. when the Fold-and-Go is positioned atop the toilet seat, a visible gap is formed between the lower surface of the Fold-and-Go's body and the toilet seat.

65. Under OPT's primary infringement theory, the Fold-and-Go's perimeter structure, including the regions corresponding to Frida's marketing terms "non-slip base" and "handles," constitutes the flange recited in Claim 11. Accordingly, as detailed above, the Fold-and-Go literally infringes at least Claim 11 of the '875 Patent.

## OPT NOTIFIES FRIDA OF INFRINGEMENT; FRIDA ASSERTS NONINFRINGEMENT AND INVALIDITY

66. On July 12, 2024, OPT sent Frida a detailed written notice identifying the '875 Patent, advising Frida that OPT contended the Fold-and-Go infringed the '875 Patent, and inviting Frida to resolve the dispute through a negotiated business resolution rather than litigation.

67. OPT's notice did not merely announce a conclusion. It included a claim chart and detailed infringement analysis addressing the structure and operation of the Fold-and-Go in relation to the asserted patent claims.

68. The notice also described Frida's pre-launch acquisition of the then-Patent Pending Potty Proud Seat, the timing of Frida's subsequent launch, the striking similarities between the products, and OPT's position that Frida had deceptively acquired and then copied OPT's product.

69. Frida responded on July 31, 2024, denying infringement and disputing the validity of the asserted claims of the '875 Patent.

70. Frida disputed infringement by contending that the claimed flange must project horizontally away from the body, that the Fold-and-Go's "non-slip base" instead

extends vertically downward, and that its "handles" are merely handles that do not extend substantially around the exterior perimeter of the body.

71. Frida also disputed OPT's alternative doctrine-of-equivalents analysis and identified several references that it contended anticipated or rendered obvious the asserted claims.

72. Frida threatened to initiate USPTO proceedings to invalidate at least Claims 11 and 14 of the '875 Patent, as well as two unasserted design patents held by OPT, and stated that "we consider this matter closed."

73. OPT thereafter undertook a substantial investigation and, on April 30, 2025, provided Frida a detailed response addressing Frida's noninfringement and invalidity positions, together with an expanded photographic claim chart mapping every limitation of Claim 11 to observable features of the Fold-and-Go.

74. OPT's response addressed Frida's noninfringement arguments by explaining why Frida's proposed construction requiring the flange recited in Claim 11 to extend only horizontally outward was inconsistent with the claim language and specification. OPT also explained that the regions of the Fold-and-Go referred to by the parties as the "non-slip base" and "handles" were physically connected and together formed the device's perimeter flange structure.

75. Frida responded again on June 12, 2025. Frida largely reiterated its earlier noninfringement position and continued to maintain that the flange recited in Claim 11 must extend horizontally from the body and therefore cannot encompass the Fold-and-Go's comparatively downwardly extending perimeter structure. Frida also newly asserted that

Claim 11 is indefinite, including based on the relationship between Claim 11's requirement that the flange form "the contact" with the toilet seat and dependent Claim 14's requirement of a pliable cover positioned upon the flange.

76. Although Frida had stated in its July 31, 2024 letter that it considered the matter closed, its June 12, 2025 letter disclosed that Frida had continued investigating the '875 Patent, including by conducting what it described as a "more comprehensive prior art search." Frida stated that it had identified additional references that "further call into question the validity of the '875 Patent," but did not identify or provide those references, and again stated, "we consider this matter closed." Frida did not initiate the threatened Patent Office proceedings that OPT had expressly invited, did not substantively respond to OPT's analysis of the previously cited references, and did not substantively address OPT's expanded photographic claim chart.

77. OPT thereafter evaluated Frida's June 12 positions, including its newly asserted indefiniteness theory, and determined that those positions did not alter OPT's infringement allegations or its assessment of the '875 Patent's validity.

78. Despite OPT's detailed infringement notice, its subsequent substantive response and expanded photographic claim mapping, its express invitation to pursue the threatened Patent Office proceedings, and multiple efforts to negotiate a business resolution, Frida continued selling the Fold-and-Go without a license.

## ADDITIONAL CONTEXT RELEVANT TO FRIDA'S PURPOSE AND STATE OF MIND IN ACQUIRING OPT'S PRODUCT AND DEVELOPING THE FOLD-AND-GO

79. The allegations below provide additional context concerning the purpose and deliberateness of Frida's acquisition of, and alleged examination, use, and copying of, OPT's product. OPT does not allege that Frida's reported conduct concerning other companies independently establishes infringement of the '875 Patent or that Frida infringed the intellectual-property rights of those companies. Rather, the information is relevant to whether Frida's conduct concerning OPT was deliberate rather than accidental; whether Frida's acquisition and evaluation of OPT's product occurred as part of a recurring product-development process that included acquiring and evaluating innovative products developed by small companies like OPT, followed by the introduction of competing products by Frida; and, more generally, Frida's purpose and state of mind in connection with the development and continued commercialization of the accused Fold-and-Go.

80. OPT has identified information indicating that the circumstances surrounding Frida's acquisition of the Potty Proud Seat may not have been isolated, but instead may reflect a broader and potentially recurring Frida product-development practice involving the identification, acquisition, and evaluation of innovative products introduced by small and emerging baby-product companies, including, in some instances, products protected by issued patents or identified as the subject of pending patent applications, followed by the development of competing Frida products.

81. In January 2024, the founder of another small baby-products company independently contacted OPT in writing and asked about OPT's experience with Frida.

Without OPT providing substantive information concerning its own experience, the founder stated in writing that Frida's "product developer just purchased all my products 'looking into them.'" She subsequently reiterated that Frida had been "buying my stuff." The founder's company develops and sells products protected by multiple issued U.S. patents and has also identified additional patent applications as pending, although OPT does not presently know whether any of the particular products acquired by Frida were subject to issued or pending patent rights. The basis for the founder's understanding of the purpose of Frida's purchases is not presently known to OPT.

82. The founder thereafter repeatedly reinitiated contact with OPT concerning Frida. In May 2024, several months after her initial communication, she again independently contacted OPT in writing after encountering another "mom founder" who, according to her, was also experiencing issues with Frida. She stated that the other founder had expressed interest in speaking with OPT and offered to connect the companies. She further explained that she had encountered the other founder through a referral and characterized the discovery that this company was also dealing with Frida as a "complete coincidence."

83. During a subsequent FaceTime discussion with OPT on May 17, 2024, OPT recalls that the founder identified the Frida product-development employee she had previously referenced as "Ed Abante." OPT had not at that time connected Abante to any prior OPT transaction. The founder's identification of Abante prompted OPT to review its historical sales records for Frida-related purchases. In the course of that review, OPT located Edward Abante's August 2022 purchase of the Potty Proud Seat and recognized its

significance. OPT's contemporaneous records thus confirmed that the same Frida product-development executive independently identified by the founder had previously acquired OPT's product. OPT thereafter incorporated the Abante purchase into its infringement correspondence with Frida. As alleged above, during the relevant time Abante held senior R&D and product-development leadership responsibilities at Frida.

84. During the same FaceTime discussion, OPT recalls that the founder also reported separate purchasing activity involving a U.S.-based molder that she understood to manufacture products for Frida. According to the founder, the purchasing activity drew her attention because of the quantity of products acquired and because expedited shipping was used in connection with at least one transaction. She further stated that she contacted the molder to determine why it had obtained her products and was informed of a connection to Frida. OPT does not presently know the precise relationship between Frida and the molder, who directed the purchase or purchases, which products were obtained, how they were evaluated or used, or the specific purpose for which they were acquired. The reported involvement of a manufacturer the founder understood to be associated with Frida, considered together with Abante's product-development role and the founder's report that Frida's product developer had purchased "all my products 'looking into them,'" provides additional context for OPT's allegation that Frida may employ a product-development process involving the identification, acquisition, and evaluation of innovative products introduced by small and emerging baby-product companies for use in developing competing Frida products.

85. During the FaceTime discussion with OPT, the founder also reported that another company known to her was then engaged in licensing or partnership discussions with Frida that, according to her, were not progressing. OPT presently does not know whether this was the same company the founder had previously identified in writing as wanting to speak with OPT or a different company. As developed further below, this report provides additional context for OPT's allegation that Frida may use licensing or partnership discussions as part of its product-development process to obtain access to, information concerning, or insight into innovative products it is evaluating for its own potential competitive development purposes.

86. In February 2026, the founder again independently contacted OPT and, while expressly stating that there was "no need to share anything," told OPT that it was "just one of 4 companies I know dealing with patent issues with Frida." OPT does not allege that this statement establishes that Frida infringed any third party's patent. Rather, considered together with the founder's earlier reports concerning Frida's acquisition and evaluation of her products, her independent identification of Abante, the reported involvement of a Frida-associated manufacturer, and her report concerning another "mom founder" dealing with Frida, the statement provides additional context for OPT's allegation that Frida's alleged conduct toward OPT may not represent an isolated instance and OPT's further allegation that Frida's product-development practices may involve the acquisition and evaluation of innovative products developed by small and emerging baby-product companies, notwithstanding known or apparent patent rights.

87. Published reporting concerning Scoville & Co., then a small and emerging baby-product company that developed the Pacidose medication-delivery device, provides an additional historical example relevant to that inquiry. According to a December 3, 2017, St. Louis Post-Dispatch article, the founder of Scoville & Co. reported that Chelsea Hirschhorn initiated contact with her after seeing Pacidose on Amazon and engaged in discussions concerning a potential license before Frida later introduced a similar medication-delivery product. The article identified Hirschhorn as Frida's chief executive, and Frida identifies Hirschhorn as its founder. The article concerned events occurring while the patent application relating to Pacidose was still pending, and OPT does not allege that Frida thereby committed patent infringement. The reported episode is relevant instead because it describes a potentially comparable sequence of product identification and commercial outreach at the founder-and-CEO level, followed by Frida's introduction of a similar competing product, years before the Abante and Rocco acquisitions. Considered together with Rocco's affirmative expression of interest in a potential collaboration after OPT raised concerns regarding competitive product development, and the earlier report to OPT that another company was engaged in licensing or partnership discussions with Frida that were not progressing, the Pacidose episode provides additional context for OPT's allegation that Frida may use licensing or partnership discussions as part of its product-development process. The recurrence of such overtures involving small and emerging baby-product companies supports the inference that Frida may direct licensing or partnership interest toward companies for whom the prospect of a commercial relationship with a larger, established company is particularly significant. It further supports the

inference that, in at least some instances, the expressed commercial interest may not reflect a genuine intention to consummate a licensing or partnership relationship, but may instead serve to facilitate access to another company's innovative product or information concerning that product while Frida considers or develops a competing product.

88. These separate incidents and reports do not establish that Frida copied any other company's product or infringed any other company's patent, nor do they establish a uniform or identical practice in every instance. Rather, considered together, they provide additional context for OPT's allegation that Frida may employ a recurring product-development process involving the identification, acquisition, and evaluation of innovative products introduced by small and emerging baby-product companies—including through direct purchases, partnership or licensing overtures and discussions, and other commercial interactions that provide access to or information concerning those products—for use in developing competing Frida products. The reported circumstances support the inference that Frida may pursue that process notwithstanding known or apparent patent rights, including where products it acquires and evaluates for purposes of developing competing products are protected by issued patents or may become protected through pending patent applications.

89. This additional context is relevant to OPT's allegations concerning Frida's conduct here. Frida acquired OPT's then-Patent Pending product through senior product-development and partnerships personnel; after OPT expressly raised concerns regarding competitive product development, Frida provided an allegedly false or misleading personal-gift explanation and expressed affirmative interest in a potential collaboration,

which OPT alleges were intended to overcome those concerns and induce OPT to provide the requested product; Frida thereafter introduced the accused Fold-and-Go incorporating multiple physical features also present in OPT's product; and, after obtaining actual knowledge of the issued '875 Patent and receiving detailed notice of OPT's infringement allegations, Frida continued commercializing the Accused Product without a license. Considered together with the additional information alleged above—including another founder's independent identification of Abante—the circumstances provide additional support for OPT's allegation that Frida's acquisition, examination, and alleged use of OPT's product were deliberate; that they occurred as part of a recurring product-development process involving the acquisition and evaluation of innovations developed by small and emerging baby-product companies—a process that may have led to the introduction of competing Frida products notwithstanding known or apparent patent rights; and that, in OPT's case, that process culminated in the alleged copying of OPT's product and continued commercialization after Frida's actual knowledge of OPT's patent rights and detailed infringement allegations.

## DAMAGES AND IRREPARABLE HARM

90. Frida's infringement has caused and continues to cause OPT substantial economic and competitive injury, including lost sales and profits, diminished operating scale, impaired growth and expansion opportunities, price pressure, lost marketplace visibility, erosion of OPT's reputation as an innovator, and loss of the brand distinction, goodwill, and market appeal associated with OPT's position as the originator and sole authorized commercial source of the patented innovation.

91. The Potty Proud Seat and Fold-and-Go are competing products directed to substantially the same consumers, uses, and purchasing decisions. Consumers have directly compared the products in reviews, including by expressly weighing their respective features and prices in deciding between them, and OPT has received multiple customer return comments through Amazon referencing Frida in connection with decisions to return the Potty Proud Seat. This marketplace evidence demonstrates that the products compete directly for the same consumers and purchasing decisions and is consistent with actual substitution between them. Amazon has also repeatedly associated the Potty Proud Seat and Fold-and-Go through its non-sponsored "Frequently Bought Together" product-recommendation feature, as reflected in numerous instances over time. This repeated, non-sponsored Amazon-generated association further demonstrates that consumers encounter the products within the same purchasing context.

92. OPT and Frida began offering the Potty Proud Seat and accused Fold-and-Go, respectively, on Amazon at approximately the same time. Both products were well received by consumers, with each generally maintaining an average Amazon customer rating of approximately 4.8 out of 5 stars for an extended period thereafter. During its early commercialization on Amazon, the Potty Proud Seat gained sales momentum that appeared substantial for a new product introduced by a small company and also received Amazon's "#1 New Release" designation in the "Travel Potties" category. For much of the first year after the Fold-and-Go began selling on Amazon, sponsored advertisements for the Fold-and-Go appeared repeatedly and prominently in multiple locations on OPT's Amazon product-detail page, often with multiple Frida advertisements appearing simultaneously on

OPT's listing. OPT recalls that the frequency and concentration of these advertisements were extraordinary, exceeding anything OPT had observed on its listing before or since. As a result, consumers viewing and considering the Potty Proud Seat were contemporaneously presented with Frida's substantially lower-priced Accused Product at the point of purchase, precisely when both products were seeking to gain traction on Amazon. Although the concentration of these advertisements subsequently diminished as the Fold-and-Go gained marketplace traction, their pervasive presence during this critical early period illustrates the intensity of the direct competition between the products and an apparent sustained advertising effort to divert customers considering the Potty Proud Seat toward the much lower-priced Accused Product.

93. Following Frida's launch of the Fold-and-Go, OPT's sales of the Potty Proud Seat have suffered substantially. Frida's national retail relationships, e-commerce presence, and established brand have enabled it to place the accused Fold-and-Go before consumers through channels in which OPT sells or seeks to sell the Potty Proud Seat, including Target and Walmart retail stores. Over time, Frida's selling price for the Fold-and-Go has ranged from approximately $8.00 to $16.99, with frequent discounting toward the lower end of that range, substantially undercutting the Potty Proud Seat's regular retail prices of approximately $35.95 to $38.99. This substantial price disparity has constrained OPT's pricing strategy and margins and contributed to the broader economic and competitive injuries detailed below.

94. Frida's commercialization occurred while OPT was scaling production, investing in manufacturing and assembly capacity, expanding its workforce, pursuing

broader distribution, and planning additional hard-goods potty-training products requiring substantial up-front development and tooling investment. Sales of the Potty Proud Seat were therefore important not only to recovering OPT's investment in developing and bringing the product to market, but also to sustaining OPT's operations and generating the returns needed to support the development, tooling, and commercialization of additional products.

95. By diverting sales from OPT's sole commercialized product during this critical growth period, Frida impaired OPT's ability to achieve manufacturing economies of scale, reduce per-unit costs, offer competitive wholesale pricing, obtain broader retail placement, recover its existing development and tooling investment, and generate the capital needed to fund additional product development and tooling. These injuries have compounded over time and continue to impair OPT's operating scale, investment capacity, retail opportunities, and growth trajectory notwithstanding OPT's subsequent efforts to develop and commercialize additional products, none of which had been commercially launched as of the filing of this action.

96. Sales of the accused Fold-and-Go have substantially eroded the significant commercial momentum the Potty Proud Seat had already achieved. As the Fold-and-Go has gained sales volume and marketplace traction, OPT's sales of the Potty Proud Seat have declined substantially. Frida's frequent and substantial discounting of the Fold-and-Go has further exacerbated that decline. The resulting loss of sales volume has impaired OPT's ability to accumulate additional customer reviews, sales history, marketplace rankings, visibility, retailer recognition, and other indicia of market acceptance that

influence future purchasing and retail-placement decisions on e-commerce and retail platforms. The Potty Proud Seat had also attracted significant early attention on social media, but the Fold-and-Go's subsequent market penetration and growing presence in social-media posts by parents diminished OPT's ability to build upon that momentum and maintain the product differentiation and consumer appeal it had initially established.

97. The asserted claims of the '875 Patent are directed to a collapsible child toilet seat as a complete device rather than to an incidental component or ancillary feature of a larger product. The accused infringement concerns the core structural configuration of the Fold-and-Go itself, a complete commercial product that competes directly with OPT's Potty Proud Seat for the same consumers and sales. Frida's alleged infringement therefore causes direct competitive injury to OPT in the market for its own product, rather than merely implicating a peripheral aspect of its business. This injury is particularly acute because, from the Fold-and-Go's launch through the filing of this action, the Potty Proud Seat was OPT's sole commercialized product and the economic foundation of its business.

98. By contrast, Frida has leveraged the commercial success and accumulated marketplace momentum of the accused Fold-and-Go to support the introduction and sale of another Frida potty-training product. On Amazon, Frida's separate, recently introduced Drop-Down Potty Seat was listed as a "child" Amazon Standard Identification Number ("ASIN") within the same "parent" product listing that already included the Fold-and-Go, causing Amazon to present the two distinct products as variants within a single listing. As a result, upon launch, the Drop-Down Potty Seat immediately appeared with approximately 5,000 global customer ratings associated with the established Fold-and-Go listing and

displayed the listing's "#1 Best Seller" designation. The Drop-Down Potty Seat thus entered the Amazon marketplace with the Fold-and-Go's accumulated customer-review history, ranking, and visibility rather than having to develop those marketplace attributes independently. Despite receiving materially less favorable consumer reviews than the Fold-and-Go—which appear to have contributed to the decline in their shared Amazon parent listing's displayed average customer rating from approximately 4.8 to 4.5 stars—the Drop-Down Potty Seat has quickly achieved substantial sales volume, further supporting the inference that its placement within the established Fold-and-Go listing materially facilitated its market entry and sales. These circumstances demonstrate that the commercial value Frida has derived from its alleged exploitation of OPT's patented innovation extends beyond sales of the accused Fold-and-Go itself, enabling Frida to leverage the accumulated marketplace position of the Accused Product to support the introduction, visibility, and sales of other potty-training products, including products receiving materially less favorable consumer reviews.

99. Frida's infringement has not only deprived OPT of sales and profits essential to funding its operations and growth, but has also forced OPT to divert substantial management time, attention, and resources away from product development, commercialization, retailer outreach, and business expansion to investigating Frida's conduct, addressing the infringement, and protecting OPT's patent rights. These simultaneous burdens have compounded the injury to OPT by constraining its ability to reinvest in its business, pursue growth opportunities, and compete effectively.

100. As noted above, the resulting injuries include loss of marketplace differentiation and erosion of OPT's commercial distinction as the source of the patented innovation. Consumers encountering the Fold-and-Go have praised the Accused Product as an "invention," including describing it as "the best invention Frida has had," while OPT has received numerous customer inquiries asking how the Potty Proud Seat differs from the substantially lower-priced Fold-and-Go. These circumstances illustrate the erosion of OPT's marketplace recognition and commercial distinction as the source of the innovation it developed and patented. OPT has also suffered impaired retailer opportunities, constrained pricing and investment decisions, and erosion of growth opportunities. These harms are difficult to quantify fully and cannot be remedied adequately through retrospective monetary damages alone.

101. Unless Frida is enjoined, its continued infringement will further entrench the market position built through the accused Fold-and-Go, increase Frida's accumulated sales history, customer reviews, marketplace rankings and visibility, further erode OPT's recognition as the source of the patented innovation, and further compound the loss of OPT's growth trajectory by making it progressively more difficult for OPT to rebuild the operating scale, product differentiation, retail opportunities, and commercial momentum that would have supported its continued expansion but for Frida's infringement.

## WILLFULNESS AND ENHANCED DAMAGES

102. Frida had actual knowledge of the '875 Patent and OPT's infringement allegations no later than July 12, 2024.

103. Before Frida obtained actual notice of the issued ’875 Patent, Frida personnel, including senior product-development and partnerships personnel, had separately acquired OPT’s product while it was clearly marked “Patent Pending,” under circumstances supporting an inference of deliberate product evaluation and copying, as alleged above.

104. OPT’s July 12, 2024 notice provided Frida detailed notice of OPT’s infringement allegations concerning the Fold-and-Go, including a claim chart and detailed infringement analysis addressing the asserted claims of the ’875 Patent.

105. OPT provided Frida further detailed notice on April 30, 2025, responding to Frida’s noninfringement contentions, explaining why the references identified by Frida did not invalidate Claim 11, and including an expanded photographic claim chart mapping every limitation of Claim 11 to observable features of the Fold-and-Go.

106. Despite its actual knowledge of the ’875 Patent, OPT’s detailed infringement analyses, and OPT’s notice that it considered Frida’s continued conduct willful, Frida continued to commercialize the Fold-and-Go without obtaining a license and without initiating the Patent Office proceedings it had threatened, notwithstanding OPT’s express invitation for Frida to do so.

107. Frida’s continued infringement after receiving actual knowledge of the ’875 Patent and detailed notice of OPT’s infringement allegations, considered together with the circumstances of Frida’s pre-notice acquisition, evaluation, and alleged copying of OPT’s product, was deliberate, intentional, knowing, and willful. OPT alleges willful infringement and seeks enhanced damages under 35 U.S.C. § 284 based on the totality of

the circumstances, including the circumstances surrounding Abante's and Rocco's separate acquisitions of the Potty Proud Seat, viewed in light of the additional allegations concerning Frida's product-acquisition and development practices involving innovative products developed by small and emerging baby-product companies.

**COUNT I — INFRINGEMENT OF U.S. PATENT NO. 11,647,875**

108. OPT incorporates by reference paragraphs 1 through 107 as though fully set forth herein.

109. OPT owns all right, title, and interest in the '875 Patent, including all claims, remedies, and rights to sue and recover damages for past, present, and future infringement, and is entitled to enforce the '875 Patent against Frida.

110. Frida has directly infringed and continues to directly infringe at least Claim 11 of the '875 Patent by making, using, offering to sell, selling, and/or importing the Fold-and-Go in the United States without OPT's authorization.

111. As alleged above, under OPT's primary infringement theory, the Fold-and-Go includes a perimeter structure with regions corresponding to Frida's marketing terms "non-slip base" and "handles." That perimeter structure constitutes the flange recited in Claim 11, and the Fold-and-Go literally satisfies every limitation of that claim. OPT further alleges infringement of Claim 14, including under the doctrine of equivalents to the extent necessary.

112. Frida's infringement has injured and continues to injure OPT. OPT seeks damages adequate to compensate for past and ongoing infringement and injunctive relief to prevent further infringement.

113. Frida's infringement of the '875 Patent has been and continues to be willful, as alleged above. OPT seeks enhanced damages under 35 U.S.C. § 284. OPT further alleges that this case is exceptional based on the totality of the circumstances and seeks an award of reasonable attorneys' fees under 35 U.S.C. § 285.

**PRAYER FOR RELIEF**

WHEREFORE, OPT respectfully requests that the Court enter judgment in its favor and against Frida as follows:

A. Adjudging that Frida has infringed and continues to infringe the asserted claims of the '875 Patent;

B. Adjudging that Frida's infringement has been willful;

C. Permanently enjoining Frida and those persons in active concert or participation with Frida from making, using, offering to sell, selling, or importing products that infringe the '875 Patent, pursuant to 35 U.S.C. § 283;

D. In the alternative, to the extent a permanent injunction does not prohibit Frida's continued infringement, awarding OPT an ongoing royalty for such infringement at a rate to be determined by the Court;

E. Awarding OPT damages adequate to compensate for Frida's infringement, including lost profits, but in no event less than a reasonable royalty, in an amount to be proven at trial;

F. Awarding OPT supplemental damages for any infringement not encompassed by the damages awarded at trial, through entry of judgment, together with an accounting of such infringement as necessary;

G. Enhancing OPT's damages pursuant to 35 U.S.C. § 284, as the Court deems appropriate in light of Frida's willful infringement and the totality of the circumstances;

H. Awarding OPT prejudgment and post-judgment interest as permitted by law;

I. Awarding OPT its costs as permitted by law;

J. Declaring this case exceptional and awarding OPT its reasonable attorneys' fees under 35 U.S.C. § 285; and

K. Awarding OPT such other and further relief as the Court deems just and proper.

**JURY DEMAND**

OPT demands a trial by jury on all issues so triable.

Dated: October 19, 2026

Respectfully submitted by,

*/s/ Alessandra Glorioso*
Alessandra Glorioso (DE Bar. No. 5757)
glorioso.alessandra@dorsey.com
Dorsey & Whitney LLP
300 Delaware Avenue, Suite 1010
Wilmington, DE 19801
Telephone: (302) 425-7166

Gregory B. Collins, AZ Bar No. 023158
(pro hac vice forthcoming)
collins.greg@dorsey.com
Dorsey & Whitney LLP
2325 East Camelback Road, Suite 900
Phoenix, AZ 85016
Telephone: (602) 735-2700

*Attorneys for Plaintiff One Proud Toddler, LLC*